IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE APPLICATION )
FOR A SEARCH WARRANT FOR ) Case No. 20-SW-2082DPR
FACEBOOK ACCOUNT )
"Tricia.Derges" )
THAT IS STORED AT PREMISES ) **FILED UNDER SEAL**
CONTROLLED BY FACEBOOK )
)

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Teresa Dailey, Special Agent with the United States Department of Health and Human
Services, Office of Inspector General, Office of Investigations, being first duly sworn, hereby
depose and state:

### I. INTRODUCTION

1. This Affidavit is offered in support of an application for the issuance of a search
warrant for information associated with certain Facebook user IDs that are stored at premises
owned, maintained, controlled, or operated by Facebook, a social networking company
headquartered in Menlo Park, California. The information to be searched is described in the
following paragraphs and in Attachment A-2. This affidavit is made in support of an application
for a search warrant under 18. U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require
Facebook to disclose to the government records and other information in its possession, pertaining
to the subscribers or customer associated with the user IDs.

2. Based on the investigation to date, I have probable cause to believe that Patricia
DERGES ("DERGES") and other staff at the clinic that she manages and works at – the Ozark
Valley Medical Clinic ("OVMC"), have engaged in the following activities, in violation of federal
law, either by individually violating the law or conspiring together to do so:

1

a. distributing controlled substances by issuing unlawful prescriptions, namely, prescriptions for Schedule II controlled substances bearing DERGES' name and signature, which DERGES does not have the authority to write, in violation of 21 U.S.C. § 841(a)(1);

b. making or using false writing or documents knowing the same to contain any materially false, fictitious, or fraudulent statement or entry in a matter within the jurisdiction of the executive branch, namely, DERGES representing herself to be a fully licensed medical doctor, when in truth and in fact she is not, in violation of 18 U.S.C. § 1001; and

c. obtaining money or property by means of false or fraudulent pretenses, representations, or promises, namely, advertising for and administering treatments purported to be stem cells, when the product used was acellular, in violation of 18 U.S.C. § 1343.

3. Based on the investigation to date, I have probable cause to believe that evidence, fruits, and instrumentalities of these unlawful activities are located within the Facebook accounts of DERGES.

## II. BACKGROUND OF THE AFFIANT

4. I am a Special Agent with the United States Department of Health & Human Services ("the Department"), Office of Inspector General ("HHS/OIG") in Kansas City, Missouri, and have been employed by the Department since October 2010. I began conducting national policy evaluations aimed at reducing fraud, waste, and abuse in programs across the Department, including programs involving managed care, laboratory tests, childcare health and safety, and mental health. In July 2015, I became a criminal investigator in HHS/OIG Office of Investigations. I have been involved in many investigations involving fraud against the Department's programs since then, most commonly health care fraud. Consequently, I am generally familiar with how various types of health care providers conduct financial transactions, keep records, and provide health care items and services to the public. I have a Bachelor of Arts in Economics from the University of Notre Dame. I completed a Masters in Public Health from the University of Kansas

2

in April 2012. I graduated from the Federal Law Enforcement Training Center in Glynco, Georgia in October 2015, and have received extensive training in conducting healthcare fraud investigations.

5.    The facts contained in this Affidavit are based upon an investigation being conducted jointly by HHS/OIG, the Federal Bureau of Investigation ("FBI"), the Missouri Medicaid Fraud Control Unit ("MFCU"), the Drug Enforcement Administration ("DEA"), and the Food and Drug Administration, Office of Criminal Investigation ("FDA/OCI").

6.    The information in this Affidavit is based on my personal knowledge, information provided by cooperating individuals, including patients of DERGES and OVMC, information provided by other law enforcement personnel, and information obtained through the review of: (1) subpoenaed documents; (2) publicly available information; (3) claims data from health care benefit programs; (4) information gathered from pharmacies; and (5) financial information, such as credit card statements.

7.    Because this Affidavit is submitted solely for the purpose of establishing probable cause to support the issuance of a search warrant for Facebook accounts, this Affidavit does not set forth all facts and circumstances known to me or to other investigators regarding this matter.

8.    Based upon my training and experience in investigating health care fraud, as well as investigating physicians for other criminal violations, I have found that medical professionals and medical clinics who also use Facebook often keep evidence of their illegal activities on Facebook, including videos, photographs of and communications with co-conspirators, information about items purchased using proceeds from illegal activity, and other evidence.

3

## III.    BACKGROUND OF INVESTIGATION

### A.    Patricia Derges

9.    DERGES graduated from Caribbean Medical University in April 2014. During her last two years, she did clinical rotations at Cox Hospital in Springfield, Missouri. DERGES did not complete a residency, and therefore was not eligible to apply for a full physician license in the state of Missouri.

10.    DERGES worked with Missouri State Representatives Lynn Morris and Keith Frederick in early 2014 to pass Assistant Physician Senate Bills 716 and 754, purportedly designed to increase medical care for individuals in underserved rural areas of Missouri. This bill allowed persons who had graduated from medical school and passed the first two steps of the United States Medical Licensing Exams ("USMLE"), but not completed a residency, to practice medicine under the authority and supervision of a collaborating physician. Once the bill was passed, the matter went to the Missouri Board of Healing Arts ("the Board") in order for the administrative rulemaking process to take place. The rules were finalized in 2017, but draft rules were promulgated before that time that included requirements for recency of the completion of the USMLE tests.

11.    In late 2016, DERGES again worked with MORRIS to amend the Assistant Physician law and pass legislation to grandfather in those who had prior medical school education and USMLE tests that otherwise would have been ineligible to apply once the rules were finalized. DERGES applied for a license in early 2017 but was determined to be ineligible by the Board due to the time that had passed since completion of the USMLE Step 2. The legislation with the grandfather clause passed a few months later. DERGES then applied again for an Assistant Physician license, which she was granted in September 2017.

4

12.    In September 2014, DERGES opened a medical mission clinic in Springfield, Missouri called Lift Up Springfield. The clinic's mission was to provide medical care, through volunteers, to the poor and indigent community in Springfield. DERGES "shadowed" doctors volunteering at the clinic prior to being licensed as an Assistant Physician. In November 2017, DERGES opened OVMC. Whereas Lift Up Springfield was run entirely by volunteers and patients could pay for services with a donation, according to DERGES, OVMC was for working people who have insurance but cannot afford their copays. Both clinics continue to operate today under DERGES' direction.

13.    In March 2017, a complaint was filed with the Board alleging that DERGES was practicing medicine without a license at Lift Up Springfield. The complainant alleged that DERGES held herself out as a physician with no corresponding license. In January 2018, the Board determined that the case did not meet the legal requirements for the Board to pursue disciplinary action.

14.    DERGES is registered with the DEA using registration number FD7329851 at the address of 5571 N. 21st St, Ozark, Missouri, one of three OVMC locations. The registration number process is further explained below.

15.    OVMC is an urgent care and walk-in clinic with three locations, and it currently employs at least three Assistant Physicians: Hussain DALAL ("DALAL"), Alok SHUKLA ("SHUKLA"), and James KALER ("KALER"). Neither DALAL, nor SHUKLA, nor KALER have a DEA registration number.

5

**B.**     <u>The Controlled Substances Act as Applicable to Provider's Prescriptions</u>

***Scheduled Controlled Substances***

16.     The Controlled Substances Act, 21 U.S.C. § 801, *et seq.,* governs the manufacture, distribution, and dispensing of various medications in the United States. Included in this regulation are certain drugs, other substances, and their immediate precursors, which are defined as "controlled substances" under 21 U.S.C. § 802(6). These controlled substances are listed within one of five established Schedules: Schedules I-V. 21 U.S.C. § 802(6).

17.     Placement of a controlled substance within a Schedule depends on the drug's medical use, potential for abuse, and risk of dependence. 21 U.S.C. § 812(b).

18.     Schedule II controlled substances are drugs and other substances that have a high potential for abuse, which may lead to severe psychological or physical dependence. Schedule II substances have a currently accepted medical use in treatment in the United States, sometimes with severe restrictions. The Schedule II drugs relevant to this investigation are:

        **a.**     **Vyvanse** – a stimulant;

        **b.**     **Amphetamine/Dextroamphetamine** – a stimulant sometimes sold as Adderall;

        **c.**     **Oxycodone** – an opioid pain medication;

        **d.**     **Methadone** – an opioid pain medication that can also be used to treat narcotic drug addiction; and

        **e.**     **Hydrocodone** – an opioid pain medication.

Schedule III controlled substances are drugs or other substances having a potential for abuse less than the drugs in Schedule II. Abuse of the drug or other substances may lead to moderate or low physical dependence or high psychological dependence. Schedule III substances have a currently accepted medical use in treatment in the United States. Aside from Suboxone,

there are not a significant amount of Schedule III drugs involved in this investigation. Suboxone is a combination of an opioid (buprenorphine) and a drug that blocks the effects of opioid medications (naloxone). It is used to treat opioid addiction. Because the medical records sought to be seized could contain Drug Abuse Records, the United States is simultaneously submitting an Application for an Order allowing the investigators to seize such records, in accordance with 42 U.S.C. § 290dd-2(b)(2)(C) and 42 C.F.R. § 2.66.

*Prescribing Scheduled Controlled Substances*

19.    A licensed health care professional, which includes a physician, as well as an assistant physician, may prescribe controlled substances. To prescribe controlled substances, a licensed health care professional must have a DEA registration number and also be authorized under state law for the jurisdiction in which the practice is located. 21 C.F.R. § 1306.03.

20.    Under Missouri law, an assistant physician with a certificate of controlled substance prescriptive authority may prescribe Schedule III, IV, or V controlled substances. An assistant physician may have restricted authority to prescribe Schedule II, when delegated the authority to prescribe controlled substances in a collaborative practice arrangement. Prescriptions for Schedule II medications prescribed by an assistant physician who has a certificate of controlled substance prescriptive authority are restricted to only those medications containing hydrocodone. Schedule III controlled substances and Schedule II - hydrocodone prescriptions shall be limited to a five-day supply without refill, except that buprenorphine may be prescribed for up to a 30-day supply without refill for patients receiving medication-assisted treatment for substance use disorders under the direction of the collaborating physician. Assistant physicians who are authorized to prescribe controlled substances shall register with the DEA and the state bureau of narcotics and

7

dangerous drugs, and shall include the DEA registration number on prescriptions for controlled substances. Mo. Rev. Stat. § 334.047 (2018).

21.    An individual (*e.g.*, a secretary or nurse) may be designated by the practitioner to prepare prescriptions for the practitioner's later signature. The practitioner is responsible for ensuring that the prescription conforms to all requirements of the law and regulations, both federal and state. 21 C.F.R. § 1306.05(f).

22.    Controlled substances may be dispensed and distributed lawfully by means of a prescription, if that prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. § 1306.04(a). Therefore, to issue lawful prescriptions for controlled substances, a medical practitioner must be registered with the DEA, and must issue the prescription for a legitimate medical purpose in the usual course of the practitioner's professional medical practice. An order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning of 21 U.S.C. § 829 and the person who knowingly issued the order shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

23.    Under Missouri law, physicians and other health care providers registered with the DEA are required to keep records with respect to controlled substances that are prescribed, administered or dispensed. Mo. Code Regs. Ann. Tit. 19, § 30-1.041(1) (2000). Records are required to be kept for at least two years from the date of the record. *Id.* at 30-1.041(2).

8

## C.    Health Care Benefit Programs[1]

### *Medicare*

24.    Medicare is a federal health benefit program for the elderly and disabled. The Department, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program. Generally, Medicare is a health insurance program for people age 65 or older and people under age 65 with certain disabilities. People who receive benefits under these federal programs are referred to as "beneficiaries."

25.    Benefits are administered through different parts of the program, referred to as Part A, Part B, Part C, and Part D. Part D is at issue in this investigation. Part D covers prescription drugs. Private companies administer the Part D coverage, and beneficiaries choose a drug plan and pay a monthly premium to the government for that coverage.

26.    When a beneficiary has Part D coverage, he or she can take a physician's prescription to a participating pharmacy. The pharmacy will fill the prescription. The beneficiary will pay a co-pay and receive the medication. The pharmacy will then seek reimbursement from the Part D sponsor. The source of the reimbursement is a combination of federal and private funds. Medicare Part D tracks the medications it pays for, which accounts for approximately 29 percent of national spending on retail sales of prescriptions drugs.

27.    Medicare will only pay for medically necessary medical services and covered drugs. Medically necessary is defined as health care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms, and that meet accepted standards of medicine.

---

[1]Private health care benefit plans are also being affected by the conduct described in this Affidavit, but the investigation to date has concentrated on the losses to the public programs.

9

*Medicaid*

28.     Medicaid is a health care benefit program that provides medical items and services to the indigent, which the states and the federal government fund jointly. The federal government funds Medicaid through the CMS.

29.     In Missouri, the federal government supplies approximately 60 percent of the funding for Medicaid. The Missouri Department of Health and Senior Services administers the Medicaid program. In order to become a provider in the Medicaid program, the prospective provider must file and have an application accepted by the program. As part of this application, the provider agrees that "No collection for Title XIX covered services will be made from the recipient-patient, his or her spouse, parent, guardian, relative or anyone else receiving public assistance, and if any payment is received or assured from any other source on the recipient-patient's account, the money will be deducted from the claim filed with Title XIX Medicaid." DERGES signed a provider agreement with Missouri Medicaid on October 30, 2018.

30.     The Medicaid program reimburses enrolled providers for various health care related services, including prescription drugs, if prescribed in the normal course of medical practice for a legitimate medical purpose by a qualified physician or other health care professional acting within the scope of his/her license.

*Maintenance of Records*

31.     Medicare and Medicaid regulations require the maintenance of records to support claims for payment submitted to their programs. Medicare requires that records be retained for the period of time required by the relevant state law or five years from the date of service if there is no requirement in state law. Missouri law requires that doctors retain medical records for seven

10

years from the date the last professional services were provided. Mo Rev. Stat. § 334.097.2(2) (2002).

*Reimbursement for Prescription Drugs*

32. Medicare and Medicaid will only reimburse for valid prescriptions issued for a legitimate medical purpose by a provider acting in the usual course of professional practice. Invalid prescriptions and prescriptions issued outside the usual course of professional practice or for other than a legitimate medical purpose are not legitimate prescriptions, and claims for reimbursement for such prescriptions are false claims. Health care benefit programs will not pay for drugs that they know were dispensed under invalid prescriptions or illegal prescriptions, and will not pay for drugs prescribed off-label.

## D. DATA-Waived Practitioners

33. Practitioners who seek to provide buprenorphine to treat individuals addicted to opioids, such as heroin, oxycodone, or hydrocodone, must obtain a waiver and be certified by the Substance Abuse and Mental Health Services Administration ("SAMSHA") of the U.S. Department of Health and Human Services. Only qualifying physicians can obtain a waiver under the Drug Addiction Treatment Act ("DATA") of 2000. The term "qualifying physician" means a physician who is licensed under state law and who meets one or more of the following conditions:

   a. The physician holds a subspecialty board certification in addiction psychiatry from the American Board of Medical Specialties.

   b. The physician holds an addiction certification from the American Society of Addiction Medicine.

   c. The physician holds a subspecialty board certification in addiction medicine from the American Osteopathic Association.

   d. The physician has, with respect to the treatment and management of opiate-dependent patients, completed not less than eight hours of training.

11

e. The physician has participated as an investigator in one or more clinical trials leading to the approval of a narcotic drug in schedule III, IV, or V for maintenance or detoxification treatment.

f. The physician has such other training or experience as the State medical licensing board (of the State in which the physician will provide maintenance or detoxification treatment) considers to demonstrate the ability of the physician to treat and manage opiate-dependent patients.

g. The physician has such other training or experience as the Secretary considers to demonstrate the ability of the physician to treat and manage opiate-dependent patients. 21 U.S.C. § 823(g)(2)(G)(ii)

34. Under the Comprehensive Addiction and Recovery Act of 2016, Nurse Practitioners, Physician Assistants, Clinical Nurse Specialists, Certified Registered Nurse Anesthetist, and Certified Nurse-Midwives, also became qualified practitioners. They must obtain no fewer than 24 hours of initial training. If required by state law, these mid-level practitioners must be supervised or work in collaboration with a qualifying physician to prescribe medications for the treatment of an opioid use disorder.

35. DATA allows qualifying practitioners to obtain a Unique Identification Number ("UIN") from DEA, which authorizes them to administer, dispense, and prescribe buprenorphine products, such as Suboxone, for use in maintenance and detoxification treatment. Issuance of a UIN authorizes a qualifying practitioner to prescribe these drugs to his or her patients for the treatment of drug addiction. However, it does not mean that the practitioner is in fact actually running a drug treatment program.

36. Suboxone is a brand name for a drug used to treat opiate addiction. Suboxone contains a mixture of buprenorphine and naloxone. Buprenorphine is a Schedule III controlled substance. According to Missouri statute, assistant physicians can prescribe buprenorphine for a 30-day supply without refill for patients receiving medication-assisted treatment for substance use disorders under the direction of the collaborating physician. Mo. Rev. Stat. § 334.037: 12(1)

12

37. DATA-Waived Practitioners ("DWPs") are those approved to administer, dispense, or prescribe buprenorphine drug products in a Narcotic Treatment Program or office setting. DWPs are also governed by confidentiality and privacy laws pursuant to 42 C.F.R. § 2.1-2.67 and 42 U.S.C. § 290dd-2.

38. On July 13, 2018, SAMSHA determined DERGES met all the requirements for a DWP, and the DEA issued her UIN XD7329851.

## E.    The Federal Food, Drug, and Cosmetic Act

39. The FDA is the federal agency responsible for protecting the health and safety of the American public by ensuring, among other things, that drugs are safe and effective for their intended uses and bear labeling that contains true and accurate information. The FDA's responsibilities include regulating the manufacture and distribution of drugs shipped or received in interstate commerce, as well as the labeling of such drugs. The FDA carries out its responsibilities by enforcing the Food, Drug, and Cosmetic Act ("FDCA") and other pertinent law and regulations.

40. The FDCA defines a "drug" as: (a) an article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (b) an article (other than food) intended to affect the structure or any function of the body of man or other animals; and (c) an article intended for use as a component of any such article in (a) or (b) above. 21 U.S.C. § 321(g)(1)(B), (C), and (D).

41. The term "new drug" means any drug not generally recognized as safe and effective among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs for use under the conditions prescribed, recommended or suggested in its labeling. 21 U.S.C. § 321(p). For a "new drug" to be lawfully distributed in interstate commerce,

13

it must be the subject of an approved new drug application ("NDA") or an approved abbreviated new drug application ("ANDA"). 21 U.S.C. §§ 331(d); 355(a).

42. A "prescription drug" under the FDCA is a drug that: (i) because of its toxicity and other potential for harmful effects, or the method of its use, or the collateral measures necessary to its use, was not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or (ii) is limited by an application approved by FDA, to use under the professional supervision of a practitioner licensed by law to administer the drugs. 21 U.S.C. § 353(b)(1).

43. The FDCA prohibits doing or causing any act being done to a drug if such act is done while the drug is held for sale after shipment in interstate commerce and results in such article being misbranded. 21 U.S.C. § 331(k).

44. The FDCA imposes strict-liability misdemeanor punishments for violations of 21 U.S.C. § 331. 21 U.S.C. § 333(a)(1); *United States v. Park*, 421 U.S. 658 (1975). The FDCA imposes felony punishment for conduct committed with an "intent to defraud or mislead" either consumers or government regulators. 21 U.S.C. § 333(a)(2); *United States v. Micheltree*, 940 F.2d 1329 (10th Cir. 1991); *United States v. Cabrera*, 284 Fed. Appx. 674, 686 (11th Cir. 2008).

## IV.    SUMMARY OF EVIDENCE ESTABLISHING PROBABLE CAUSE

45. The investigation has revealed that DERGES is illegally dispensing controlled substances by issuing prescriptions for Schedule II controlled substances outside the authority given to her by the state of Missouri as an assistant physician. If the health care benefit programs knew that the prescriptions were invalid and illegal, they would not reimburse the pharmacies for these prescriptions.

14

46.    DERGES submitted a false statement to SAMSHA while applying to be a DWP. DERGES identified herself as a fully licensed Medical Doctor, and represented that she had the authority to herself become a DWP, when, in fact, in Missouri, such authority comes from the collaborating physician of an assistant physician.

47.    Through Facebook, television promotions, in person seminars, and other means, DERGES promoted a stem cell treatment product that she claimed could cure everything from wounds to Lyme disease. The product, made by the University of Utah ("the University"), is actually acellular, which the University told DERGES on multiple occasions. Between December 2018 and April 2020, DERGES received checks exceeding $45,000 from individuals and companies for what they believed to be stem cell treatments.

## A.    DERGES' PRESCRIBING OF SCHEDULE II CONTROLLED SUBSTANCES

48.    Between February 2014 and June 2014, DERGES worked with Representatives Morris and Fredericks in the preparation of the Assistant Physician Senate Bills 716 and 754. DERGES provided the documentation that represented the graduate physician's point of view. Section 334.037: 12(1) of Senate Bills 716 and 754 states: "An assistant physician with a certificate of controlled substance prescriptive authority as provided in this section may prescribe any controlled substance listed in schedule III, IV, or V of section 195.017 when delegated the authority to prescribe controlled substances in a collaborative practice arrangement." The law was amended in 2015 in Missouri House Bill 709 and the following was added, "...and may have restricted authority in Schedule II...Prescriptions for Schedule II medications prescribed by an assistant physician who has a certificate of controlled substance authority are restricted to only those medications containing hydrocodone."

15

49. In August 2017, DERGES took a Jurisprudence Examination as part of her licensing application to become an assistant physician. Question 18 states, "An assistant physician with a certificate of controlled substance prescriptive authority as provided in Chapter 334 may prescribe any Schedule III, IV, or V of section 195.017, and may have restricted authority in Schedule II, when delegated the authority to prescribe controlled substances in a collaborative practice arrangement." DERGES correctly circled True.

50. On November 17, 2017, DERGES signed an Assistant Physician Application for Controlled Substance Prescriptive Authority. The application reads, in part, "I, Patricia Ashton DERGES, hereby certify under oath that I am the person named in this application…that all statements I have made herein are true and that I have personally read, reviewed and answered each of these questions; I understand that:

- I may prescribe any controlled substances listed in Schedule III, IV, or V of section 195.017, and may have restricted authority in Schedule II-hydrocodone as delegated to me by my supervising physician and as stated in my supervision verification form;

- Schedule III controlled substances and Schedule II-hydrocodone prescriptions shall be limited to a five day supply without refill;

- I have read Chapter 334 RSMo, Chapter 195 RSMo, 20 CSR 2150-2 and 19 CSR 30 which contains the Statutes, Rules and Regulations governing the prescribing of controlled substances and the practice of assistant physicians.

*Medicare*

51. Medicare claims showed that between January 1, 2019, and April 10, 2020, DERGES issued Medicare beneficiary R.W. 16 prescriptions for Amphetamine/Dextroamphetamine, 15 prescriptions for Methadone HCL, and one prescription for Oxycodone.

16

52.     R.W. was interviewed on or around April 8, 2020. R.W. stated that DERGES does

not accept Medicare or Medicaid insurance. R.W. volunteers at the Clinic in exchange for medical

care from DERGES. R.W. has "many underlying medical conditions."

***Walmart Pharmacy***

53.     I reviewed records from Walmart regarding prescribing of Schedule II controlled

substances by DERGES. The subpoenaed records showed that between July 1, 2018, and May 4,

2020, DERGES wrote 32 prescriptions for Schedule II controlled substances that were filled at

Walmart pharmacies:

| Patient | Prescription Written Date | Drug Name | Quantity |
|---|---|---|---|
| C.J. | 8/1/2018 | VYVANSE 20MG          CAP | 30 |
| C.J. | 9/5/2018 | VYVANSE 20MG          CAP | 30 |
| M.R. | 1/18/2019 | AMPHETA/DEXTRO COMBO 30MG TA | 30 |
| J.M. | 7/2/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| J.M. | 8/6/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| A.H. | 8/7/2019 | AMPHETA/DEXTRO COMBO 10MG TA | 60 |
| A.H. | 9/5/2019 | AMPHETA/DEXTRO COMBO 10MG TA | 60 |
| J.M. | 9/5/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| J.M. | 10/2/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| A.H. | 10/10/2019 | AMPHETA/DEXTRO COMBO 10MG TA | 60 |
| P.V. | 10/25/2019 | OxyCODONE 10MG          TAB | 9 |
| J.M. | 11/2/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| A.H. | 11/7/2019 | AMPHETA/DEXTRO COMBO 10MG TA | 60 |
| K.K. | 11/18/2019 | AMPHETA/DEXTRO COMBO 5MG TAB | 60 |
| J.M. | 11/27/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| K.K. | 12/12/2019 | AMPHETA/DEXTRO COMBO 10MG TA | 30 |
| J.M. | 12/29/2019 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| A.H. | 1/7/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 60 |
| K.K. | 1/22/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |
| J.M. | 1/25/2020 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| A.H. | 2/11/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 60 |
| K.K. | 2/16/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |
| J.M. | 2/25/2020 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| B.H. | 2/27/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |

17

| | | | |
|------|-----------|------------------------------|-----|
| A.H. | 3/10/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |
| K.K. | 3/18/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |
| J.M. | 3/20/2020 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| B.H. | 4/2/2020  | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |
| A.H. | 4/13/2020 | AMPHETAM/DEXTRO ER 5MG CAP   | 30 |
| K.K. | 4/23/2020 | AMPHETA/DEXTRO COMBO 5MG TAB | 60 |
| J.M. | 4/24/2020 | AMPHETA/DEXTRO COMBO 20MG TA | 60 |
| B.H. | 5/4/2020  | AMPHETA/DEXTRO COMBO 5MG TAB | 30 |

***Family Pharmacy***

54.     I reviewed records from Family Pharmacy regarding prescribing of Schedule II controlled substances by DERGES. The subpoenaed records showed that between July 1, 2018, and April 17, 2020, DERGES wrote 52 prescriptions for Schedule II controlled substances that were filled at multiple Family Pharmacy locations:

| Patient | Prescription Written Date | Drug Name | Quantity |
|---------|---------------------------|-----------|----------|
| R.W. | 1/10/2019 | METHADONE HCL 10 MG TABS   | 240 |
| R.W. | 1/10/2019 | METHADONE HCL 10 MG TABS   | 240 |
| R.W. | 1/10/2019 | METHADONE HCL 10 MG TABS   | 240 |
| R.W. | 2/3/2019  | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| M.R. | 2/15/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 30  |
| R.W. | 2/28/2019 | oxyCODONE HCL 15 MG TABS   | 20  |
| R.W. | 3/8/2019  | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| M.R. | 3/25/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 30  |
| R.W. | 4/4/2019  | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| R.W. | 4/4/2019  | METHADONE HCL 10 MG TABS   | 240 |
| M.R. | 4/25/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 30  |
| R.W. | 5/2/2019  | METHADONE HCL 10 MG TABS   | 240 |
| R.W. | 5/2/2019  | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| M.R. | 5/20/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 60  |
| R.W. | 5/30/2019 | METHADONE HCL 10 MG TABS   | 240 |
| R.W. | 5/30/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| M.R. | 6/18/2019 | AMPHETAMINE-DEXTROAMP 30MG | 60  |
| R.W. | 6/24/2019 | METHADONE HCL 10 MG TABS   | 360 |
| R.W. | 6/24/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60  |
| M.R. | 7/16/2019 | AMPHETAMINE-DEXTROAMP 30MG | 60  |

18

| R.W. | 7/19/2019 | METHADONE HCL 10 MG TABS | 360 |
|------|-----------|--------------------------|-----|
| R.W. | 7/19/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| M.R. | 8/14/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 60 |
| R.W. | 8/21/2019 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 8/21/2019 | VYVANSE 40 MG CAPS | 30 |
| R.W. | 8/21/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| M.R. | 9/11/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 60 |
| R.W. | 9/18/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 9/18/2019 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 9/18/2019 | VYVANSE 40 MG CAPS | 30 |
| M.R. | 10/8/2019 | DEXTROAMP-AMPHETAMIN 30 MG | 60 |
| R.W. | 10/14/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 10/14/2019 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 10/15/2019 | VYVANSE 40 MG CAPS | 30 |
| R.W. | 11/14/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 11/14/2019 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 11/20/2019 | VYVANSE 40 MG CAPS | 30 |
| R.W. | 12/16/2019 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 12/16/2019 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 12/18/2019 | VYVANSE 40 MG CAPS | 30 |
| C.C. | 1/13/2020 | VYVANSE 40 MG CAPS | 30 |
| R.W. | 1/15/2020 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 1/15/2020 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 2/12/2020 | VYVANSE 40 MG CAPS | 30 |
| R.W. | 2/13/2020 | DEXTROAMP-AMPHETAMIN 20 MG | 60 |
| R.W. | 2/13/2020 | METHADONE HCL 10 MG TABS | 360 |
| C.C. | 3/9/2020 | DEXTROAMP-AMPHET ER 15 MG C | 30 |
| R.W. | 3/13/2020 | DEXTROAMP-AMPHET ER 30 MG C | 30 |
| R.W. | 3/13/2020 | METHADONE HCL 10 MG TABS | 360 |
| R.W. | 4/10/2020 | METHADONE HCL 10 MG TABS | 360 |
| R.W. | 4/10/2020 | DEXTROAMP-AMPHET ER 30 MG C | 60 |
| C.C. | 4/17/2020 | DEXTROAMP-AMPHET ER 15 MG C | 30 |

## B.    **False Statements**

55.    On or around January 1, 2018, DERGES applied for a DEA number. There are two relevant options for a "Business Category" under Form 224: Practitioner and Mid-Level Practitioner. DERGES qualifies as a Mid-Level Practitioner due to Assistant Physicians requiring

19

a collaborating physician to practice. Indeed, if one chooses the Business Category of Mid-Level Practitioner, the last "Business Activity" option is "MLP-Assistant Physician." DERGES chose the Practitioner version of Form 224. There is only one option for Business Activity, "Practitioner."

56. Item 5 of the Pre-Application Checklist states, "To register as a practitioner, you must hold one of the following degrees: a. DMD, b. DDS, c. MD, d. DO, e. DPM, f. DVM." Item 6 states, "You must currently have a full state license in the state where you will register." Item 8 of the Pre-Application Checklist states, "You must currently possess all required state authority to handle controlled substances for the state of your registered business/office address. Some states require a separate controlled substances license in addition to a medical, dental, or veterinary license. If you do not currently possess these credentials, do not apply until all state requirements are fulfilled." DERGES checked the box, "I have read and understood the information and agree to the terms outlined above."

57. Had DERGES chosen the correct application as a "MLP-Assistant Physician," a different set of items on the Pre-Application Checklist would have appeared. This includes Item 4, which states, "A limited amount of information regarding the controlled substance authority of a mid-level practitioner may be found using the Mid-Level Practitioners (MLP) Authorization by State chart. Item 6 states, "You must currently have a full state license in the state you will register. If your state mandates additional requirements such as a collaborative agreement or prescriptive authority to handle controlled substances (i.e., administer, dispense, and prescribe), you must meet these requirements BEFORE you apply for a DEA registration."

58.     DERGES did not disclose her limited authority in prescribing controlled substances on her DEA application. Under "Drug Schedules", DERGES checked the box for each Schedule, including Schedule II Narcotic and Schedule II Non-Narcotic.

59.     Question 4 of the application states, "Are you currently authorized to prescribe, distribute, dispense, conduct research, or otherwise handle the controlled substances in the schedules for which you are applying under the law of the state or jurisdiction in which you are operating or propose to operate?" DERGES includes her state assistant physician license number and her state controlled substances license number. Finally, the application contains a warning, "21 USC 843(d), states that any person who knowingly or intentionally furnishes false or fraudulent information in the application is subject to a term of imprisonment not more than 4 years, and a fine under Title 18 of not more than $250,000, or both." DERGES electronically signed her name below the statement "By typing my full name in the space below, I hereby certify that the foregoing information furnished on this electronic DEA application is true and correct and understand this constitutes an electronic signature for the purposes of this electronic DEA application only." As a result of this application, DERGES was given a DEA number as a Practitioner, rather than a Mid-Level Practitioner-Assistant Physician.

60.     On or around July 7, 2018, DERGES sought to obtain a DATA waiver to practice opioid dependency treatment with approved buprenorphine medications. DERGES notified SAMSHA of her intent to practice this form of medication-assisted treatment ("MAT"). On her application under "Practice Type," DERGES chose "MD/DO." "AP" is not available as a choice because it is not a qualifying practitioner under the law. Had DERGES chose a similar MLP such as a nurse practitioner or physician's assistant, because Missouri is a state that requires

21

collaborating physicians to also have a DATA waiver, DERGES would have been required to provide that information.

61.    Item 12 on the application states, "I certify that the information presented above is true and correct to the best of my knowledge...Note: Any false, fictitious, or fraudulent statements or information presented above or misrepresentations relative thereto may violate Federal laws and could subject you to prosecution, and/or monetary penalties, and or denial, revocation, or suspension of DEA registration." DERGES checked the box and electronically signed her name in the space below.

62.    As part of the application process for a DWP, SAMSHA verifies practitioner information with DEA, which then issues the UIN for the practitioner. Because DERGES has previously applied for a DEA number as Practitioner rather than a Mid-Level Practitioner, SAMSHA had no reason to question DERGES' representation as an MD/DO on her application. The information DERGES provided to SAMSHA was provided to DEA, which was confirmed by what they had on file for DERGES, and the UIN DERGES was issued by DEA subsequently identified her as a Practitioner-DW30, rather than an MLP-DW30. The false and misleading information DERGES provided to both agencies caused neither to question the expanded authority DERGES sought and had no legal standing to possess.

63.    In 2018, Missouri Senate Bill 718 added the following language to RSMo § 334.037: 12(1), "...except that buprenorphine may be prescribed for up to a thirty-day supply without refill for patients receiving medication assisted treatment for substance use disorders under the direction of the collaborating physician." This section was not in force and effect until August 28, 2018.[2]

---

[2] Some sections of this bill did have an emergency clause allowing for the force and effect of law upon passage and approval, but Section 334.037 was not one of those sections.

22

64.    Dr. Luke VAN KIRK is the collaborating physician of DERGES. VAN KIRK was interviewed by agents on April 2, 2020. When VAN KIRK started to oversee DERGES' work in early 2019, he asked her if he needed to get buprenorphine certification as a DWP. DERGES told him it was not an issue and was unnecessary.

65.    On or around August 29, 2019, a state employee in the Missouri Medical Marijuana Division of the Department of Health and Senior Services, contacted DERGES to let her know that the Board determined that Assistant Physician licenses do not meet the requirements of the department's definition of a Physician. DERGES wrote back seeking a possible "exception":

> Can you please ask them if an Assistant Physician [that] has been certified to provide Bupenorphine (They are MAT certified: which is Medication Addiction Treatments: meaning they have met national guidelines, were trained and certified under US medical requirements for doctors and have also met the Professional Registration requirements for Bupenorphine treatments). This means that they have been issued an X-DEA number (meaning they have two DEA numbers: 1 for controlled substances and the other for Bupenorphine) if they could be approved to do these MMJ certifications? Most likely there are no more than 2 or 3 AP's in the entire state that are certified to do this: if that many.

## C.    Treatment of Medicaid Beneficiaries

66.    On or around October 30, 2018, DERGES enrolled as a Medicaid provider. In this provider agreement, DERGES agreed to accept the conditions of participation of the Title XIX Participation Agreement for Medicaid Services. Item 4 of the Participation Agreements states, "I understand that I cannot collect for Title XIX covered services from the recipient-patient, his or her spouse, parent, guardian, relative or anyone else receiving public assistance, and if any payment is received or assured from any other source on the recipient patient's account, that amount will be deducted from the claim I filed with Title XIX Medicaid."

23

67.     A review of the bank records shows at least 5 individuals who wrote checks to OVMC in amounts between $32.17 and $216, were eligible for Medicaid and had claims from other Medicaid providers around the time the checks were written to OVMC.

| Patient Name | Date Check Written | Amount |
|---|---|---|
| A.H. | 3/1/2019 | $50.00 |
| J.R. or C.R. | 2/20/2019 | $216.00 |
| R.S. | 12/2/2019 | $100.00 |
| S.B. or E.B. | 12/20/2019 | $32.74 |
| S.M. or V.M. | Various | $759.00 (total) |

## D.     "Stem Cell" Treatments

68.     In or around January 2019, DERGES began directly ordering a product from the University called "Allograft." The product is derived from amniotic fluid and registered with the FDA. The product is sterile filtered and therefore 100 percent acellular. Allograft is used by the University in clinical trials. The University sold Allograft to DERGES for approximately $250 per unit.

69.     Grand Jury subpoenas were sent to financial institutions. Investigators obtained relevant records possessed in the normal course of business, including bank statements and financial activity related to DERGES and OVMC. A review of these documents showed patients who paid for care at OVMC generally fell into one of two different categories. Either the patient paid less than $500 dollars per visit, or the cost was over $1,500, sometimes higher than $4,000. These payments were made by either check or credit/debit card.

70.     Patient T.A. was interviewed on May 11, 2020. T.A. had an elbow injection by DERGES in March 2019. DERGES told T.A. she was getting an injection of amniotic fluid that contained stem cells. DERGES told her, "if it can grow a baby, it can grow what's necessary to heal the tendonitis." T.A. paid DERGES $1,750 for the injection. T.A. did not know that

24

DERGES was an Assistant Physician. The injection did not heal the tendonitis. T.A. took three months off of work, which did relieve the pain.

71.     On or around May 13, 2019, via e-mail, a University employee responded to a concern from DERGES regarding a chiropractor in Branson, Missouri, who was calling a product stem cells that DERGES did not believe had live stem cells in it. The University employee told DERGES, "As you know there are very little stem cells in birth tissues. Most of the cells are epithelial cells and most of these cells are dead (see attached new publication}." The publication attached was entitled, "Are Amniotic Fluid Products Stem Cell Therapies?" The paper concluded, "Our study was unable to identify any mesenchymal stem cells ("MSCs") in 3 commercially available amniotic fluid products ("AFPs") or in unprocessed, fresh-frozen amniotic fluid…Although these AFPs should not currently be categorized as "stem cell" treatments, they may still represent a promising tool for orthopedic treatments given the presence of cytokines and growth factors."

72.     On or around August 26, 2019, the University employee again responded to an email from DERGES. DERGES said, "I have a couple of questions as I was finishing all the paperwork and info for the show in Las Vegas (Sept 3 – 8)…In reviewing Predictive's Folder of paperwork/info: I noted that they actually listed the #'s of how many MSCs and other products, including naming the main cytokines inside their AF, do we have any of this on ours or how should I answer this if someone at the shows asks. Which is possible since Predictive will be there." The University employee responded, "Our product is acellular so it doesn't have any MSCs."

73.     From September 3-7, 2019, in Las Vegas, Nevada, Pain Week occurred. Pain Week is advertised as "the preferred resource for frontline practitioners treating acute and chronic pain."

Booth number 418 at the Pain Week Expo belonged to "Regenerative Biologics: Stem Cell Therapy." The website for the company contains a quote from DERGES on the home page.



"THE DOCTOR OF THE FUTURE WILL GIVE NO MEDICINE, BUT WILL RELY ON THE GOD GIVEN POWERS OF THE BODY'S ABILITY TO HEAL ITSELF COUPLED WITH A HEALTHY DIET AND EXERCISE TO REVERSE, HEAL and PREVENT INJURY AND DISEASE."
— TRICIA DERGES, MD

74. Patient A.L. was interviewed on May 15, 2020. A.L. had seen DERGES for two appointments in September and October of 2019 to receive stem cell injections in the hip and knee. DERGES told A.L. the stem cell treatment was not FDA approved. A.L. paid DERGES a total of $7,350 for the two treatments. A.L. stated the treatments did not make her condition worse but, "didn't do squat."

75. On April 8, 2020, law enforcement personnel searched Facebook for the Facebook pages of OVMC and DERGES. Two accounts were identified as user IDs OVMCSpringfield and Tricia.Derges. A preservation request was submitted to Facebook for these two pages, and Facebook responded by assigning their internal case number of 4707010. Both pages display many posts publicly, allowing any person to view them.

76. In or around February 2020, a video was posted on OVMC's Facebook page called, "Stem Cell Time!" During the video, DERGES explained how she works directly with the University and the "top research scientist there." She stated that if another doctor wants to buy the shots, DERGES can sell it to them. "I am their distributor." DERGES claims there are "no side effects" from the product and boasts a "95% success rate."

77. On or around March 21, 2020, the OVMC Facebook page posted, "POSSIBLE SOLUTION TO PREVENTION AND REVERSAL OF CORONA – RIGHT HERE IN SPRINGFIELD, MO." DERGES went on to say "I work directly with the top Academic University Regenerative Medicine: Lab and Production Facility, backed by the FDA in the United

26

States. They are able to do IND research and have published many articles on this research in the medical journals. I have had tremendous success with MSCs...It is also important to know that this is a human transplant tissue and is required to be administered ONLY by a licensed MD or DO. No other medical personnel should be giving these injections...I have been successful in reversing kidney disease...we will soon be starting to work on regenerating spinal cord injuries."

78. On or around April 11, 2020, DERGES posted on her personal Facebook page, "This is really exciting! Those that watched my news interview on Wednesday regarding my Mesenchymal Amniotic Stem Cell treatment protocol being approved by the FDA for a pilot test on 10 COVID patients: know the treatment was successful...This amazing treatment stands to provide a potential cure for COVID-19 patients that is safe and natural; requiring NO drugs and producing NO side-effects. It can also strengthen the lungs of the higher risk individuals so that should they contract COVID-19, should be able to fight it off."

79. Patient B.P. was interviewed on May 4, 2020. B.P. stated that "everything was made plain, black and white" by DERGES. B.P. called it "stem cell stuff" from embryonic stem cells from live baby births. DERGES told him the product was from the University. B.P. has advanced stage Lyme Disease. B.P. paid DERGES $2,500 for the treatment. DERGES was administering the product through an IV injection on or around April 23, 2020. B.P. stated that he had another appointment scheduled for May 7, 2020.

80. The "Indications and Usage" for Allograft states, "Human Amniotic Fluid Allograft may be used in covering wounds and as an injectable for covering connective tissue. Amniotic Fluid Allograft shall not be used intravenously. Clinicians using Amniotic Fluid Allograft should possess the training and skills necessary for use."

27

81.    Patient H.I., who lives outside the state of Missouri, was interviewed on May 14, 2020. H.I. had contracted COVID-19 in April of 2020 and was experiencing many of the common symptoms including difficulty breathing and fatigue. DERGES contacted H.I. through phone conversation and text message, stating she had a treatment that "the FDA has approved for the COVID trial test." She then told H.I. she would "send you an overnight of 2cc's if [sic] stem cells to nebulize," and that "Stem cells are progressive, which means they will continue to regenerate tissue for months to come." When H.I. received the Allograft fluid on April 25, 2020, he followed DERGES' instructions, but did not note any change in his condition. DERGES did not request payment for the Allograft, but she stated the treatment would have cost $15,000 in the area where H.I. lives.

## V.    RECORDS TO BE SEIZED

### A.    Probable Cause to Believe Records are Located

82.    Publicly viewable Facebook posts on both DERGES' and OVMC's Facebook pages have been reviewed by the affiant and are known to advertise the benefits of stem cell treatments while speaking specifically about the acellular product provided to DERGES by the University.

83.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

84.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

28

security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

85. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

86. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

87. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition,

29

Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

88.     Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

89.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

90.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

91.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

92.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

93.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

94.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

95.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

96.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

97.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user

31

accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

98.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

99.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

100.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

32

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

101.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## VI.    CONCLUSION

102.    Based on the above information, there is probable cause to believe that fruits, instrumentalities, and evidence of violations of federal law 21 U.S.C. § 841(a)(1); 18 U.S.C. § 1001; and 18 U.S.C. § 1343, as more fully described in Attachment B-2, are in the custody and control of Facebook, as fully described in Attachment A-2.

103.    Because this investigation is ongoing, I request that the warrant, application, affidavit in support of the warrant and any other documents pertaining to this warrant be sealed. Although DERGES is aware that an investigation is occurring, the disclosure of this warrant and

the breadth of the investigation could compromise the investigation and lead to the destruction of

evidence. I declare upon the penalty of perjury that the information contained herein is true and

correct to the best of my knowledge.

Teresa Dailey, Special Agent
Health and Human Services
Office of Inspector General
Office of Investigations

Subscribed and sworn to before me electronically this 11th day of June, 2020.

David P. Rush.
Chief United States Magistrate Judge